UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X
                                                          :
ADOLFO MENDEZ-NOUEL,                                      :
                                                          :
                                        Plaintiff,        :              10 Civ. 3388 (PAE)
                         -v-                              :
                                                          :              OPINION & ORDER
GUCCI AMERICA, INC.,                                      :
                                                          :
                                        Defendant,        :
                                                          :
-----------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:


        Plaintiff Adolfo Mendez-Nouel, a former clothing salesperson at Gucci America, Inc.

("Gucci"), claims that during his employment he was subjected to a hostile work environment on

account of his sex and sexual orientation, and that he was retaliated against for complaining

about that environment, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42

U.S.C. § 2000e *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law

§ 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code

§ 8-101 *et seq.*  Gucci now moves for summary judgment against Mendez-Nouel's complaint.

For the following reasons, the Court grants Gucci's motion for summary judgment as to Mendez-

Nouel's Title VII and NYSHRL claims and declines to exercise supplemental jurisdiction over

his NYCHRL claims.

I.      **Background and Undisputed Facts**[1]

On November 12, 2007, Mendez-Nouel was hired by Gucci as a Sales Associate in the Women's Ready-to-Wear ("WRTW") Department in Gucci's flagship Fifth Avenue, Manhattan Store.  Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.  Mendez-Nouel initially reported to Ami Garbiras; in September 2008, after Garbiras was promoted, David Gray was hired as the WRTW manager. Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.  The WRTW manager, in turn, reported to the store manager, who was Mark Mitsukawa at the time Mendez-Nouel was hired; in summer 2008 Michael Daly replaced Mitsukawa.  Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3.

During Mendez-Nouel's tenure, at least four documented incidents occurred as to which he was either formally reprimanded or informally spoken to about his conduct at or in relation to the workplace.  These incidents, the facts of which are undisputed, are as follows:[2]

In March 2008, Mendez-Nouel was extensively quoted in a *New York Times* article about Gucci; Mendez-Nouel's then-manager, Mitsukawa, spoke to him, and cautioned him to refrain from speaking to the press about internal corporate matters.  Def. 56.1 ¶¶ 4–6; Pl. 56.1 ¶ 4.a.

---

[1] The Court's account of the underlying facts of this case is drawn from the parties' submissions in support of and in opposition to the instant motion, including:  Defendant's Local Rule 56.1 Statement ("Def. 56.1") (Dkt. 33); the Declaration of Kristina Hammond in Support of Defendant's Motion for Summary Judgment ("Hammond Decl.") (Dkt. 31) with attached exhibits, including the deposition of Adolfo Mendez-Nouel ("Pl. Dep."); Plaintiff's Local Rule 56.1 Statement ("Pl. 56.1") (Dkt. 39); and the Declaration of Rick Ostrove in Opposition to Defendant's Motion for Summary Judgment ("Ostrove Decl.") (Dkt. 37) with attached exhibits, including the deposition of Andrew Grier ("Grier Dep.") and the deposition of Iva Mendez ("Mendez Dep.").  References herein to a paragraph in a party's 56.1 statement incorporate by reference the evidentiary materials in that paragraph.

[2] The parties take issue with each other's characterization of the incidents—Gucci casts them as serious, and Mendez-Nouel downplays them.  *See, e.g.*, Def. 56.1 ¶ 4, Pl. 56.1 ¶ 4.  However, these characterizations, as opposed to the facts of the incidents, are irrelevant to the Court's analysis.

In May or June 2008, Mendez-Nouel became embroiled in a dispute with a co-worker. Def. 56.1 ¶ 7; Pl. 56.1 ¶ 7.  This disagreement led the co-worker to request a meeting between Mendez-Nouel, the co-worker, and the WRTW assistant manager, at which the dispute was resolved.  *Id.*

In summer 2008, Mendez-Nouel had another dispute with a co-worker, this time about the proper crediting for a clothing sale.  Def. 56.1 ¶ 8; Pl. 56.1 ¶ 8.  Although Mendez-Nouel did not raise the issue directly with the co-worker, he approached managers to dispute how a sale was credited as between him and the co-worker.  *Id.*  During the episode, Mendez-Nouel said he "just want[ed] to go home"; the assistant manager told him that if he did not want to remain in Gucci's employ, he could leave.  *Id.*

In September 2008, during a store inventory, Mendez-Nouel shouted "Mets suck!" over a balcony in the store, yelling to a co-worker below.  Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9.  Daly, the store manager, heard this outburst, as did an outside auditor.  *Id.*  Gray, Mendez-Nouel's direct supervisor, reprimanded him for this incident and placed a "Memo to File" in his personnel file. *Id.*  Mendez-Nouel concedes that this incident merited discipline by Gray; he apologized to Daly for his conduct.  Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10.

In addition, during early 2009, Mendez-Nouel was warned several times about other incidents, including hanging up the phone on a customer, shoving a garment at a customer in a rude fashion, and appearing dejected on the sales floor.  *See, e.g.*, Def. 56.1 ¶¶ 11–15; Pl. 56.1 ¶¶ 11–15.  Mendez-Nouel concedes that management approached him and raised concerns about these incidents; however, he disputes that the incidents themselves occurred.  Mendez-Nouel instead claims that the underlying incidents were fabricated as a pretext to justify terminating him.  *See, e.g.*, Pl. 56.1 ¶¶ 13–15.  Mendez-Nouel does admit, however, that on February 20,

2009, immediately after he allegedly hung up on the customer, he left his post on the sales floor, retired to the employee locker room, and broke down in tears.  Def. 56.1 ¶ 16; Pl. 56.1 ¶ 16.  He also admits that he feared for his job at this time.  Pl. 56.1 ¶ 15.

On February 23, 2009, Mendez-Nouel attended a meeting with his manager, Gray, a Gucci HR representative, and the store's assistant manager.  Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17.  At that meeting, management discussed the incidents for which Mendez-Nouel had recently been disciplined (those which Mendez-Nouel claims did not occur), and asked Mendez-Nouel whether he was committed to his job at Gucci.  Def. 56.1 ¶¶ 17, 21; Pl. 56.1 ¶¶ 17, 21.  Mendez-Nouel stated that he was distracted by personal issues outside work, including a recent unsuccessful audition for a movie and a possibility that his wife was pregnant, but he stated that he was committed to his job.  Def. 56.1 ¶¶ 19–20; Pl. 56.1 ¶¶ 19–20.[3]

Three days later, on February 26, 2009, Mendez-Nouel sent an email to Lori Strober-Lewin, the HR representative who had been present at the February 23 meeting, to formally complain about alleged harassment by his immediate supervisor, Gray, and the store manager, Daly.  Def. 56.1 ¶ 25; Pl. 56.1 ¶ 25.  Mendez-Nouel claimed that he was (1) touched by Daly, (2) subjected to inappropriate comments by Gray, and (3) retaliated against for failing to accept the touching or to participate in inappropriate conversations.  *Id.*  Although Mendez-Nouel asserts that he had once made an offhand remark to a co-worker to the effect that Daly had touched him in an unwelcome manner, *see* Pl. 56.1 ¶ 22, the February 26, 2009 complaint was his first formal statement to HR about alleged harassment.  Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22.

---

[3] Mendez-Nouel now asserts that his claim to have been "distracted" was a mere deflection to avoid discussing the harassing conduct by Daly and Gray.  *See* Pl. 56.1 ¶¶ 19–20.  He does not, however, dispute having stated at the February 23, 2009 meeting that he was distracted.

Gucci quickly launched an investigation into Mendez-Nouel's complaint.  Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26.  On March 4, 2009, as part of that investigation, Mendez-Nouel met with Strober-Lewin, Gucci's HR representative, and Gucci's regional manager (Daly's immediate supervisor). *Id.*  Strober-Lewin took notes at this meeting.  These reflect that Mendez-Nouel acknowledged that business was slow, and that he felt he was "next in line" to be terminated.  Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28.

After the meeting, Mendez-Nouel went to lunch; upon his return, he was observed to be shaking and out of breath.  Def. 56.1 ¶¶ 30–31; Pl. 56.1 ¶¶ 30–31.  A fellow employee called an ambulance, and Mendez-Nouel was diagnosed with a panic attack.  *Id.*

On March 5, 2009—the day after Mendez-Nouel's panic attack at the store—a co-worker, Meryam Kabsy, called HR representative Strober-Lewin.  Kabsy expressed concern over Mendez-Nouel's condition and behavior.  Def. 56.1 ¶ 33; Pl. 56.1 ¶ 33.  Kabsy stated that she believed Mendez-Nouel's recent agitation was creating a dangerous situation at the workplace. Def. 56.1 ¶ 34; Pl. 56.1 ¶ 34.[4]  Kabsy also told HR that Mendez-Nouel had said to her that

---

[4] Mendez-Nouel argues that Gucci is wrong to include statements such as these from Strober-Lewin's investigation report in its 56.1 statement, claiming that it is inadmissible hearsay.  That objection is not well-founded.  The investigation report from which Kabsy's testimony is related constitutes a business record under Fed. R. Evid. 803(6)(b).  *See Brauninger v. Motes*, 260 F. App'x 634, 637 (5th Cir. 2007) (investigation notes were based on investigators' personal knowledge and were the result of a regularly conducted business activity that was an ordinary part of the investigators' duties as human resources managers); *Malek v. Fed Ins. Co.*, 994 F.2d 49 (2d Cir. 1993) (social worker's investigation notes are admissible under business records exception); *Barney v. Consol. Edison Co. of N.Y.,* No. 99-cv-823, 2009 U.S. Dist. LEXIS 127178, at *46–47 (E.D.N.Y. Oct. 1, 2009).

In any event, the statements by co-workers to Strober-Lewin, as recorded in her investigation report, are considered only for a limited purpose:  They are relevant to Gucci management's state of mind at the time it decided to terminate Mendez-Nouel.  In other words, the statements made by Gucci employees are considered not for the truth of the matters asserted in those statements, but for their effect on the listener.  *See Cameron v. Cmty. Aid for Retarded Children, Inc.*, 335 F.3d 60, 66 n.2 (2d Cir. 2003) (where complaints were "not used to prove the truth of the matter

"something big was going to happen" but he "couldn't tell her" what it was.  Def. 56.1 ¶ 35; Pl.

56.1 ¶ 35.  Kabsy also informed HR that Mendez-Nouel had related to her a story from his

childhood in which he had shot somebody with a BB gun.  Def. 56.1 ¶ 36; Pl. 56.1 ¶ 36.

Strober-Lewin also interviewed two other co-workers of Mendez-Nouel's.  As reflected

in her report, these co-workers related other provocative statements that Mendez-Nouel had

made in the workplace.  These included that:  (1) "People are ungrateful and something big is

going to happen and he knows about it but they don't"; (2) "people had become bad towards

each other and people don't understand life until something bad happens" and "something big

should happen so people will care about each other"; (3) Mendez-Nouel "would make jokes

about shooting and would point his finger to himself.  He would talk about shooting people and

he would read the internet and talk about the world and how it should end and start over.  He said

somebody should be shot"; and (4) Mendez-Nouel had made comments about the world coming

to an end, or the destruction of the world, around the time of the 2008 presidential election.  Def.

56.1 ¶ 40; Pl. 56.1 ¶ 40.[5]

---

asserted, but to establish [supervisor's] state of mind, they are not hearsay as [plaintiff] contends"); *Delia v. Donahoe,* 862 F. Supp. 2d 196, 202 n.5 (E.D.N.Y. 2012) (written investigation statement was "not hearsay because the Court is not considering it for the truth of the matter asserted"); *Barney,* 2009 U.S. Dist. LEXIS 127178, at *46 ("[w]here a decision-maker claims to have relied on [an investigation] report, it is admissible to show that the decision-maker 'legitimately believed [that plaintiff] had acted improperly'") (citation omitted).

Finally, to the extent that an investigation witness related comments that Mendez-Nouel is alleged to have made, that hearsay-within-hearsay may independently be considered because Mendez-Nouel's statements are those of a party opponent. *See* Fed. R. Evid. 801(d)(2).

[5] Mendez-Nouel disputes making some of these statements, claiming in some instances that the co-workers purported to have related them testified at deposition that they did not recall telling HR about these statements.  However, the speakers' later lack of recollection does not suffice to create a dispute regarding the contents of a business record.  Moreover, as noted, the relevant issue for purposes of this lawsuit with respect to these statements is whether Gucci had a good-faith belief, based on its investigation, that Mendez-Nouel had made them.  Because that is the

On March 6, 2009, after speaking with various employees, Gucci's HR department determined that numerous employees were concerned about Mendez-Nouel's references to shooting and violence.  It decided to suspend Mendez-Nouel pending further investigation.  Def. 56.1 ¶ 44; Pl. 56.1 ¶ 44.  A contemporaneous e-mail from Gucci's global HR director, explaining the decision, stated:

> [W]e have had three employees inform us today that they are seriously concerned about their safety as Adolfo has made numerous comments about shooting people (not employees but people in general) and that Michael Daly, David Gray and Gucci will "get what's coming to them and something big is going to happen." He sounds seriously disturbed and I made the decision at this time to suspend him until further notice.

Pl. 56.1 ¶ 44.

After the suspension, HR continued investigating Mendez-Nouel's behavior.  Def. 56.1 ¶ 45; Pl. 56.1 ¶ 45.  Strober-Lewin, the HR employee, spoke with three other co-workers who had not previously been interviewed.  Her investigation report reflects that those witnesses attributed the following statements to Mendez-Nouel:  (1) two co-workers stated, consistent with the earlier interviews, that Mendez-Nouel had said that "something big was going to happen"; and (2) another co-worker also stated that Mendez-Nouel went on "tirades" and "if you disagreed with him you were on his list."  Def. 56.1 ¶ 45; Pl. 56.1 ¶ 45.  A third co-worker expressed "relief" that Mendez-Nouel was no longer on the sales floor.  *Id.*

On March 18, 2009, Strober-Lewin interviewed Mendez-Nouel by telephone as part of the investigation.  Pl. 56.1 ¶ 126.

---

limited purpose for which the Court considers these statements, and because it is not disputed that the statements reflected in Strober-Lewin's investigative report were communicated to Gucci prior to its decision to terminate Mendez-Nouel, the Court declines to exclude them from consideration on the grounds that Mendez-Nouel disputes having made them.

On March 19, 2009, following the additional interviews, Gucci terminated Mendez-Nouel's employment.[6]  *Id.* ¶ 127.

## II.    Procedural History

After his termination, Mendez-Nouel filed an administrative complaint with the Equal Employment Opportunity Commission, claiming that his rights under Title VII had been violated.  Compl. ¶ 4.  On March 15, 2010, the EEOC issued plaintiff a "right to sue" letter.  *Id.*

On April 22, 2010, Mendez-Nouel filed this lawsuit.  Dkt. 1.  Mendez-Nouel claims that he was subject to a hostile work environment on account of his sex (male) and sexual orientation (heterosexual) when: (1) Gray, his direct manager, made a number of sexually-charged comments on the sales floor, *see* Compl. ¶¶ 13–16; and (2) Daly, the store manager, touched him on the shoulders and back, *see* Compl. ¶¶ 11–12.

As to Gray, Mendez-Nouel alleges that Gray said on at least two occasions that Mendez-Nouel was "gay inside" and that Gray "bet [Mendez-Nouel was] gay."  Compl. ¶ 13.  Mendez-Nouel also asserts that Gray would say that men in the store were "hot" and that he would "do that guy."  *Id.* ¶ 14.  Gray also allegedly would relate stories of his nights out at gay clubs, including at least one episode where Gray was "pole dancing" or engaging in other sexualized behavior.  *Id.* ¶ 15.  Mendez-Nouel also complains of an instance in which Gray described a YouTube video he had seen.  In that video, Anna Nicole Smith is drawn as a smurf character and

---

[6] In his response to Gucci's Rule 56.1 statement, Mendez-Nouel impugns the investigation of Kabsy's complaint as pretextual.  He claims that the contents of Strober-Lewin's report are unreliable in their entirety because the whole investigation was a sham designed to provide cover for his retaliatory termination.  *See* Pl. 56.1 *passim*.  However, as discussed *infra*, Mendez-Nouel's conclusory claim that the investigation was a "sham" is not, by itself, sufficient to create an issue of fact as to whether this is so.  Mendez-Nouel, as a percipient witness to his own statements, *has* created an issue of fact whether he made various statements attributed to him by co-workers, but he has not put at issue whether these statements were attributed to him by co-workers speaking to Gucci's HR department, and, most important, whether those statements had been communicated to Gucci at the time he was terminated.

said "you should smell my smurph"; Mendez-Nouel states that he understood this to be a reference to female genitalia. *Id.* ¶ 24. Mendez-Nouel states that he was uncomfortable when Gray made such comments, and that he did not participate in the sexualized banter. *Id.* ¶ 16.

As to Daly, Mendez-Nouel asserts that in or around September 2008, Daly, whom Mendez-Nouel alleges to be homosexual, approached him from behind, grabbed his shoulders, and gave them a brief massage; Mendez-Nouel alleges that at the conclusion of the massage, Daly ran his hand down Mendez-Nouel's back, stopping above the buttocks. *Id.* ¶ 11. Mendez-Nouel also alleges that, also in or about September 2008, Daly gave him a second brief shoulder rub. *Id.* ¶ 12.

In addition to claiming a hostile work environment, Mendez-Nouel also claims that he was retaliated against, in two ways. First, he claims that he was denied a day off during the Christmas season, but that a co-worker who did join in Gray's sexual banter was given a day off during that time period. *Id.* ¶ 17. Second, he claims that he was terminated in March 2009 in retaliation for his February 26, 2009 complaint about his alleged harassment at the hands of Gray and Daly. *Id.* ¶ 36.

On May 4, 2012, following discovery, the Court held a pre-motion conference regarding Gucci's proposed motion for summary judgment. On June 8, 2012, Gucci filed the instant motion. Dkt. 29–35. On July 13, 2012, Mendez-Nouel filed his opposition. Dkt. 37–39. On July 27, 2012, Gucci filed its reply. Dkt. 40. On September 4, 2012, the Court held oral argument on this motion.

III.   **The Parties' Arguments**

In moving for summary judgment, Gucci makes three arguments. First, as to Mendez-Nouel's claims of discrimination, Gucci argues that Mendez-Nouel was not harassed based on

his sex or sexual orientation, because (1) the alleged conduct and comments were not directed at

him because of these characteristics, and (2) the conduct alleged does not rise to the level of a

hostile work environment.  Def. Br. 15, 18–19.  Second, as to his retaliation claims, Gucci argues

that Mendez-Nouel was not retaliated against for engaging in protected activity, because (1) his

decision not to engage with Gray's sexual banter is not itself a protected activity, and (2)

although Mendez-Nouel's complaint was a protected activity, Gucci had a neutral justification

for his termination which he has not shown to be pretextual–his "erratic and frightening conduct"

in the workplace, as related to Gucci during its investigation.  Def. Br. 22.   Third, as to Mendez-

Nouel's state law claims under NYSHRL and NYCHRL, Gucci asks that the Court, to the extent

it does not dismiss those claims as deficient, not exercise supplemental jurisdiction over them.

Def. Br. 24.

In response, Mendez-Nouel argues that discovery has revealed triable issues of fact on

both his discrimination and retaliation claims, as brought under Title VII, the NYSHRL, and the

NYCHRL.

## IV.    Applicable Legal Standard

Summary judgment may be granted only where the submissions, taken together, "show []

that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  The movant bears the burden of demonstrating the

absence of a material factual question; in making this determination, the court must view all facts

"in the light most favorable" to the non-movant.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986); *see also Holcomb v. Iona Coll.*, 521 F.3d 130, 132 (2d Cir. 2008).  "A party may not rely

on mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment," because "conclusory allegations or denials cannot by themselves create a

genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  "Only disputes over facts that might affect the outcome of the suit under the governing law" will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In cases alleging discrimination or retaliation, courts must use "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions."  *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted).  However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).  Thus, in such cases, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."  *Holcomb*, 521 F.3d at 137.

Mendez-Nouel's claims logically divide between his substantive claims of sex and sexual orientation discrimination and harassment (based on the comments and conduct of Gray and Daly) and his claims of retaliation.  The Court addresses these categories of claims in turn.

## V.     Mendez-Nouel's Substantive Claims Under Title VII and the NYSHRL

In claiming discrimination and harassment, Mendez-Nouel alleges that Gray's comments and Daly's touching of him were directed at him on the basis of his gender and/or his sexual orientation, and that these actions together created a hostile work environment.  As noted, Mendez-Nouel brings claims under Title VII, the NYSHRL, and the NYCHRL.  The Court analyzes the substantive claims under Title VII and the NYSHRL together, because the

substantive standards for liability under these statutes are coextensive.[7]  Measured against the

standards, it is clear that the evidence, even when viewed in the light most favorable to Mendez-

Nouel, is insufficient to support claims under Title VII and the NYSHRL.

A.     Whether the Allegedly-Harassing Comments or Actions Were Directed at
       Mendez-Nouel Because of his Sex or Sexual Orientation

"It is axiomatic that mistreatment at work, [including] subjection to a hostile work

environment . . . is actionable under Title VII only when it occurs because of an employee's

sex."  *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (citing *Oncale v. Sundowner*

*Offshore Servs., Inc.*, 523 U.S. 75, 79–80 (1998)); *see also Alfano v. Costello*, 294 F.3d 365, 377

(2d Cir. 2002) ("It is . . . important in hostile work environment cases to exclude from

consideration personnel decisions that lack a linkage or correlation to the claimed ground of

discrimination.").

In cases of alleged same-sex harassment, the Court must "distinguish between simple

teasing or roughhousing among members of the same sex, and conduct which a reasonable

person in the plaintiff's position would find severely hostile or abusive."  *Oncale*, 523 U.S. at

81–82.  "The prohibition of harassment on the basis of sex requires neither asexuality nor

androgyny in the workplace; it forbids only behavior so objectively offensive as to alter the

'conditions' of the victim's employment."  *Id.*

---

[7] "[C]laims brought under New York State's Human Rights Law are analytically identical to
claims brought under Title VII."  *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98,
107 n.10 (2d Cir. 2011) (citation omitted).  Accordingly, as discussed *infra* at Section VII, the
Court exercises supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367.  To be
sure, Title VII does not protect against discrimination on the basis of sexual orientation, instead
only proscribing discrimination on the basis of "race, color, religion, sex or national origin."  *See*
42 U.S.C. § 2000e-2(a); *Murray v. Visiting Nurse Servs.*, 528 F. Supp. 2d 257, 269 (S.D.N.Y.
2007) (citing *Dawson v. Bumble & Bumble*, 398 F.3d 211, 217 (2d Cir. 2005)).  The NYSHRL,
by contrast, does protect against discrimination on the basis of sexual orientation.  Accordingly,
the ensuing discussion, to the extent it addresses claims of discrimination on the basis of sexual
orientation, is relevant only to Mendez-Nouel's NYSHRL claims.

Accordingly, in same-sex harassment cases, courts in this Circuit, drawing upon the

Supreme Court's decision in *Oncale*, have "suggested three evidentiary routes to prove gender-

based discrimination in a same-sex harassment case:  (1) evidence that the harasser is

homosexual and that the harassment is motivated by sexual desire; (2) evidence that the harasser

was motivated by general hostility to employees of victim's sex; [or] (3) comparative evidence

that the harasser treated employees of both sexes differently."  *Borski v. Staten Island Rapid*

*Transit*, No. 04-cv-3614, 2006 U.S. Dist. LEXIS 89242, at *9–10 (E.D.N.Y. Dec. 11, 2006)

(citing *Oncale*, 523 U.S. at 80–81); *see also Farren v. Shaw Envtl., Inc.*, 852 F. Supp. 2d 352,

358 (W.D.N.Y. 2012); *Fenn v. Verizon Commc'ns, Inc.*, No. 08-cv-2348, 2010 U.S. Dist. LEXIS

23831, at *43–45 (S.D.N.Y. Mar. 15, 2010); *Romano v. Stora Enso Corp.*, No. 07-cv-4293, 2010

U.S. Dist. LEXIS 24937, at *53–54 (E.D.N.Y. Feb. 12, 2010) (Report & Rec.), *adopted by* 2010

U.S. Dist. LEXIS 24908 (E.D.N.Y. Mar. 17, 2010).

The Court now applies these standards to Daly's touching of Mendez-Nouel and to

Gray's comments to him.

### 1.    Daly's Alleged Touching of Mendez-Nouel

Mendez-Nouel asserts that he has raised a triable issue of fact as to whether Daly, whom

he alleges is gay, touched Mendez-Nouel out of "sexual desire."  Pl. Br. 15.  But the actions of

which Mendez-Nouel complains—two brief shoulder rubs (one of which concluded with Daly

running his hand down Mendez-Nouel's back), both of which occurred in a public place and

were unaccompanied by any suggestive comments—are not evocative of such desire.  Indeed,

claims of discrimination premised on far more suggestive conduct have been found wanting.

*See, e.g.*, *Soliman v. Deutsche Bank*, No. 03-cv-104, 2004 U.S. Dist. LEXIS 9087, at *32

(S.D.N.Y. May 20, 2004) (no inference of desire where supervisor treated plaintiff "favorably,

touched his arm, touched his shoulders in meetings when describing their relationship as 'close' .

. . sat close to him, commented that he was a 'good looking guy,' told [plaintiff] he was gay,

invited him to social events and an allegedly 'gay' bar on two occasions, [and] asked him about

his personal life"); *Moran v. Fashion Inst. of Tech.*, No. 00-cv-1275, 2002 U.S. Dist. LEXIS

19387, at *18 (S.D.N.Y. Oct. 7, 2002) (supervisor's conduct of lingering next to plaintiff,

touching him on the arm or shoulder and complimenting him on his appearance was "not

inherently sexual").  Nor were the areas of Mendez-Nouel's body that Daly allegedly touched

(his shoulder and back) "gender-specific body parts" which could reasonably give rise to the

inference that Daly touched them *because* of their sexual significance.  *See Redd v. N.Y. State

Div. of Parole*, 678 F.3d 166, 179 (2d Cir. 2012) (vacating grant of summary judgment where

alleged female-on-female harassment included allegations that defendant had repeatedly groped

plaintiff's breasts).

Mendez-Nouel's argument against summary judgment assumes the conclusion that Daly

*must* have had the requisite "sexual desire" because Daly touched him.  But the fact that Daly

may be gay, without more, does not imbue his every touch with the "sexual desire" necessary to

sustain a harassment claim.  And there is no evidence that Daly made any sexualized, flirtatious,

or innuendo-laden comment to Mendez-Nouel, or confided in others that he was attracted to

Mendez-Nouel.  Further, it is undisputed that Daly touched or hugged Gucci employees of both

sexes, thus rendering unreasonable any inference that Daly touched only those to whom he was

attracted on the basis of gender.  *See* Def. 56.1 ¶¶ 56–57; Pl. 56.1 ¶¶ 56–57; Hammond Decl. Ex.

37 (chronicling complaint by female employee of Daly giving her unsolicited hugs); McAdams

Dep. 41–42 (Hammond Decl. Ex. 29).  Mendez-Nouel has done nothing to distinguish the

episodes complained of from the other, categorically non-sexual episodes in which Daly touched

female employees. *Cf. Gore v. Health Research Inst.*, No. 02-cv-2432, 2007 U.S. Dist. LEXIS 27993, at *2 (E.D.N.Y. Apr. 16, 2007) (excluding as irrelevant to discrimination analysis the assertion that supervisor had undermined the employee, where the employee testified that the supervisor had done the same thing to "just about everybody in the unit," men and women included).

Accordingly, on the record at summary judgment, a reasonable jury could not find that Daly touched Mendez-Nouel because of "sexual desire" without engaging in "unsubstantiated speculation." *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).  To the extent Mendez-Nouel's claims of discrimination are based on Daly's having touched him, he has failed to carry his burden to show a genuine issue of fact as to whether Daly touched him because of his sex or sexual orientation.

### 2.    Gray's Alleged Comments in Mendez-Nouel's Presence

Gray's comments towards Mendez-Nouel, as alleged, fall into five discrete categories. As to four of them, Mendez-Nouel has similarly failed to adduce evidence tending to show that Gray directed comments of a sexual nature towards him because of his sex or sexual orientation. As to one category of comments, however, Mendez-Nouel has carried his burden to come forward with evidence that the comments were directed at him because of his sex and sexual orientation.

Specifically, Mendez-Nouel takes issue with five categories of comments allegedly made by Gray:

1.    Gray allegedly told Mendez-Nouel, on several occasions, "You know what, I know you're gay inside.  You are so gay.  You just don't know it."

2.    Gray often made comments about other men's appearances, saying things like "that guy is hot" or "I would totally do that guy."

15

3.      Gray would commonly relate stories of his night life, including "sex-based exploits," including stories of a party including pole dancing, and two male employees kissing in the bathroom at the company Christmas party.

4.      Once, Gray told employees a story about a YouTube video depicting Anna Nicole Smith, as a smurf, in which the smurf referred to female genitalia.  During this conversation, Gray allegedly also commented that he believed Anna Nicole Smith and her lawyer were having a homosexual relationship.[8]

5.      Gray tried to steer every conversation towards a discussion about homosexuality or gay pride.

Pl. Br. 16 (citing Pl. 56.1 ¶¶ 81–87).

Significantly, Mendez-Nouel concedes that Gray talked about personal or sexual matters "in front of everybody," both male and female, homosexual and heterosexual employees.  Def. 56.1 ¶ 29; Pl. 56.1 ¶ 29.  As to the categories of comments identified above as #2, #3, #4, and #5, that concession, without more, defeats the inference he asks the Court to draw that the comments were made in Mendez-Nouel's presence because of his sex or sexual orientation.  *Cf. Gore*, 2007 U.S. Dist. LEXIS 27993, at *2.  And Mendez-Nouel has not identified any evidence in support of his assertion that these comments were directed at Mendez-Nouel because of his gender or sexual orientation.

However, the first category of comments by Gray—that Mendez-Nouel was "gay inside" and just didn't "know it"—is different.  On its face, these statements are reasonably interpreted as having been directed at Mendez-Nouel because he is a male who asserts he is heterosexual but is in fact homosexual, *i.e.*, directed to Mendez-Nouel because of Mendez-Nouel's sex and sexual orientation (actual or perceived).  Accordingly, were Mendez-Nouel's claim of a hostile work

---

[8] Mendez-Nouel claims in his motion papers that Gray *showed* employees, including Mendez-Nouel, the video.  *See* Pl. 56.1 ¶ 85.  However, that claim was flatly contradicted by Mendez-Nouel himself in his deposition, at which he testified that Gray merely *talked about* the video.  *See* Mendez-Nouel Dep. 233–34, 265–66.  The Court therefore does not credit Mendez-Nouel's claim in his motion papers, because it contradicts his prior sworn testimony.  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir. 1997).

environment to go to trial, these statements, but not those falling within categories #2 through #5, could be put before a jury as probative evidence.  *See* Fed. R. Civ. P. 56(g); *Pensioenfonds Metaal en Techniek v. Strategic DSRG, LLC*, No. 09-cv-5644, 2011 U.S. Dist. LEXIS 9624, at *18 (S.D.N.Y. Jan. 24, 2011).

### B.     Whether the Alleged Harassment Constitutes a Hostile Work Environment

Mendez-Nouel claims that Daly's touching and Gray's comments combined to expose him to a hostile work environment.  A hostile work environment claim under Title VII:

> [R]equires a showing [1] that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and [2] that a specific basis exists for imputing the objectionable conduct to the employer.  *Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997) (internal citations and quotation marks omitted).  The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered.  *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 188 (2d Cir. 2001) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)); *Brennan v. Metro. Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999).  This test has objective and subjective elements: the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that environment to be abusive.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).  As a general rule, incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive."  *Perry*, 115 F.3d at 149 (citation and internal quotation marks omitted).  Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness.  *Brennan*, 192 F.3d at 318; *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (noting that "we have made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment").

*Alfano v. Costello*, 294 F.3d 365, 373–74 (2d Cir. 2002).  Title VII "does not set forth 'a general civility code for the American workplace,'" *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Oncale*, 523 U.S. at 80), and thus "does not reach genuine but innocuous differences in the ways men and women routinely interact with members of the same sex and of the opposite sex."  *Oncale*, 523 U.S. at 81.

In analyzing a hostile work environment claim, the Court is "required to look to the record as a whole and assess the totality of the circumstances, considering a variety of factors, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 102 (2d Cir. 2010) (citation omitted). Analyzed under this rubric, neither Daly's touching, nor Gray's comments, nor the two together suffice to create a genuine issue of fact as to whether Mendez-Nouel suffered a hostile work environment.

### 1.     Daly's Alleged Touching of Mendez-Nouel

As noted above, Mendez-Nouel alleges that Daly twice grabbed his shoulders, each time for less than five seconds. On one of those occasions, Daly allegedly ran his hand down Mendez-Nouel's back. These events can only be characterized as "episodic" and "isolated," and do not constitute the "concerted" or "continuous" course of harassment that Title VII and the NYSHRL require. *Alfano*, 294 F.3d at 374.

Mendez-Nouel attempts to salvage these claims by arguing—correctly—that many cases have found that a small number of serious incidents can qualify as sufficiently serious to raise a genuine issue of fact as to whether a work environment was hostile. *See* Pl. Br. 17. As Gucci rightly observes, however, the facts of those cases are a far cry from those presented here. *See Cruz v. Coach*, 202 F.3d 560 (2d Cir. 2000) (harasser said women should be "barefoot and pregnant," leered at the victim, and repeatedly backed victim into a wall in a threatening manner); *Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1995) (victim was allegedly raped by three co-workers); *Kotcher v. Rosa & Sullivan Appliance Ctr.*, 957 F.2d 59 (2d Cir. 1992) (harasser made numerous comments about victim's breasts, and pretended to masturbate behind

18

plaintiffs' backs); *Breeding v. Cendant Corp.*, No. 01-cv-11563, 2003 U.S. Dist. LEXIS 6558 (S.D.N.Y. Apr. 17, 2003) (harasser made comments about victim engaging in "wild sex," demonstrated sexual positions in front of co-workers, and asked on a conference call whether victim was wearing a "garter belt, panties, and stockings").

This line of case law thus does not salvage Mendez-Nouel's claims. His allegations about Daly do not come close to constituting a hostile work environment under Title VII or the NYSHRL.

### 2.      Gray's Alleged Comments to Mendez-Nouel

Gray's comments to Mendez-Nouel also do not suffice to constitute a hostile work environment under Title VII or the NYSHRL. As an initial matter, the Court has already found that only one set of Gray's alleged comments can reasonably be said to have been motivated by Mendez-Nouel's sex or sexual orientation. Gray's several statements to Mendez-Nouel—to the effect that, "You know what, I know you're gay inside. You are so gay. You just don't know it"—viewed alone, cannot prevent summary judgment for Gucci on Mendez-Nouel's Title VII and NYSHRL claims. *See Alfano*, 294 F.3d at 373–74.

However, even if the Court considered all of Gray's alleged comments together—and, it bears repeating, there is no evidence whatsoever that the vast majority of them were directed at Mendez-Nouel because of his sex or sexual orientation—they would still be insufficient to be actionable. That is because these comments, even viewed together, lack the pervasiveness, ridicule, or intimidation necessary to create a hostile work environment for purposes of Title VII. "Conduct that can be categorized as a few isolated incidents, teasing, casual comments or sporadic conversation will not be deemed to create a hostile work environment." *Davis-Bell v. Columbia  Univ.*, No. 10-cv-4362, 2012 U.S. Dist. LEXIS 38490, at *38 (S.D.N.Y. Mar. 19,

2012).  Further, that Mendez-Nouel may have taken offense at Gray's comments does not mean that he was being discriminated against on the basis of sex or sexual orientation.  *Cf. Fox v. Sierra Dev. Co.*, 876 F. Supp. 1169, 1176 (D. Nev. 1995) ("Pictures, literature and discussions of homosexual conduct do not inherently intimidate, ridicule, or insult men.  [ . . . ]  That an otherwise reasonable man might be highly offended by homosexual depictions is not enough. He must reasonably feel the homosexual depictions strike at his gender or attack him because of his gender . . . .").

Notably, courts in this Circuit have found far more serious non-physical conduct to fall short of creating a hostile work environment.  *See, e.g.*, *Marshall v. N.Y. City Bd. of Elections*, 322 F. App'x 17 (2d Cir. 2009) (summary order) (finding no hostile work environment where homosexual supervisor showed plaintiff a "sexual device he had purchased for his partner," even though plaintiff "may have been legitimately offended" by such talk); *Murray v. Visiting Nurse Servs.*, 528 F. Supp. 2d 257, 278–79 (S.D.N.Y. 2007) (male-to-male statements in the workplace such as "you're such a bitch," "good morning ladies," "when are you going to come out of the closet," and "are you ladies going to the parade?" insufficient to defeat summary judgment on hostile work environment claim).

In sum, Gray's comments, while inappropriate, fail, as a matter of law, to form the basis of a finding of a hostile work environment for purposes of Title VII and the NYSHRL.

### 3.    Daly's Touching and Gray's Comments In Combination

Mindful of its obligation to "look to the record as a whole and assess the totality of the circumstances," *Gorzynski*, 596 F.3d at 102, the Court also considers whether Daly's episodic touching and Gray's sporadic comments combined to create an arguably hostile work environment.

20

On review of the record as a whole, and in line with numerous other cases from within this Circuit, the Court readily concludes that they do not. *See, e.g.*, *Dayes v. Pace Univ.*, No. 98-cv-3675, 2000 U.S. Dist. LEXIS 3698, at *2–3, *11–12 (S.D.N.Y. Mar. 24, 2000), *aff'd*, 2 F. App'x 204 (2d Cir. 2001) (granting summary judgment to defendant where plaintiff was subject to six sexual comments, multiple requests for dates, was screamed at by a supervisor, and was touched on the back); *Lucas v. S. Nassau Cmty. Hosp.*, 54 F. Supp. 2d 141, 147–48 (E.D.N.Y. 1998) (denying NYSHRL hostile work environment claim where supervisor brushed against plaintiff three times, touched plaintiff three times, briefly touched plaintiff's back or shoulders five to seven other times, asked about the color of plaintiff's underwear, said plaintiff wanted to "go to bed" with her, and said "fuck you" to plaintiff on two occasions); *Ricard v. Kraft Gen. Foods, Inc.*, No. 92-cv-2256, 1993 U.S. Dist. LEXIS 21062, at *9 (S.D.N.Y. Mar. 16, 1993), *aff'd*, 17 F.3d 1426 (2d Cir. 1994) (four sexually-oriented incidents insufficient to withstand summary judgment). The episodes Mendez-Nouel complains of are simply too episodic, insufficiently serious, and, most important, insufficiently tied to his gender or sexual orientation, to have materially altered the conditions of Mendez-Nouel's employment on the basis of any protected classification. Gucci's motion as to Mendez-Nouel's substantive Title VII and NYSHRL claim is, therefore, granted in its entirety.

## VI.   Mendez-Nouel's Claims of Retaliation Under Title VII and the NYSHRL

Mendez-Nouel also claims that Gucci retaliated against him for his February 26, 2009 complaint against Daly and Gray by placing him on administrative leave and ultimately terminating his employment.[9]

---

[9] Mendez-Nouel also suggests that he was retaliated against for failing to participate in Gray's allegedly-inappropriate discussions with other co-workers and for failing to react positively to Daly's alleged shoulder rubs. Gucci argues that, as a matter of law, this conduct cannot supply

Under Title VII, it is unlawful for an employer to discriminate against an employee because that employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a). The statute thus "prohibits an employer from taking 'materially adverse' action against an employee because the employee opposed conduct that Title VII forbids or the employee otherwise engaged in protected activity."  *Tepperwien v. Entergy Nuclear Operations, Inc.*, 663 F.3d 556, 567 (2d Cir. 2011).  Title VII and the NYSHRL are therefore violated when "a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause."  *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993).

In adjudicating retaliation claims, courts follow the "familiar burden-shifting framework" of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]."  *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).  "Claims for retaliation [under NYSHRL] are analyzed under the same burden-shifting framework established for Title VII cases."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).  To prove a prima facie case of retaliation, a plaintiff

---

the basis for a retaliation claim, because the mere rejection of purported harassment is not, itself, a protected activity.  There is a split among the district courts as to whether rejection of a sexual advance is, itself, a protected activity that can support a retaliation claim, *see, e.g.*, *Wagner v. Burnham*, No. 03-cv-1522, 2006 U.S. Dist. LEXIS 6659, at *48–51 (N.D.N.Y. Feb. 1, 2006) (collecting cases), and the Second Circuit has expressly declined to resolve the issue, *see Fitzgerald v. Henderson*, 251 F.3d 345, 366 (2d Cir. 2001).  However, here, the Court need not determine which strand of case law to follow, for two reasons.  First, Mendez-Nouel has not taken issue with Gucci's argument that the *sole* protected activity at issue in this lawsuit was Mendez-Nouel's February 26, 2009 complaint to Strober-Lewin.  *See* Pl. Br. 18.  He thus has waived any claim that his other actions were protected activities on which a retaliation claim can be based.  Second, insofar as Mendez-Nouel alleges that Gucci's placing him on leave and then terminating him were acts of retaliation, the record, as explained below, demonstrates a legitimate, non-retaliatory, and non-pretextual basis for Gucci to take such action: the disquieting and alarming reports about Mendez-Noel's workplace behavior related first by Kabsy and then by other co-workers in the interviews occasioned by her complaint.

must establish: (1) that she participated in a protected activity; (2) that participation in the protected activity was known to the employer; (3) that the employer thereafter subjected her to a materially adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse employment action.  *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  The burden of proof at the prima facie stage has been characterized as "de minimis."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).

If this initial burden is met, "a presumption of retaliation arises," and the burden shifts to "the employer to articulate a legitimate, non-retaliatory reason for the adverse employment action."  *Id.*  If and when the employer meets that burden of production, "'the *McDonnell Douglas* framework . . . disappear[s] and the sole remaining issue . . . [is] discrimination *vel non.*'"  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 77 (2d Cir. 2001) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142–43 (2000)).  The plaintiff must then prove the ultimate issues without any "benefit of . . . intermediate burdens and presumptions." *Id.*; *see also Holcomb*, 521 F.3d at 138.  The plaintiff may satisfy this burden by showing "pretext," *i.e.*, that the employer's proffered reason was false, *see, e.g.*, *Reeves*, 530 U.S. at 143, 147; but even in the absence of such a showing, a plaintiff may prevail by demonstrating that "an employment decision was motivated both by legitimate and illegitimate reasons," *Holcomb*, 521 F.3d at 141–42; *see, e.g.*, *Reeves*, 530 U.S. at 147 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination . . . ."); *Holtz*, 258 F.3d at 78.

However, "if the record conclusively reveal[s] [a] nondiscriminatory reason for the employer's decision, or if the plaintiff create[s] only a weak issue of fact [as to pretext] and there [i]s abundant and uncontroverted independent evidence that no discrimination ha[s] occurred,"

23

then the employer is entitled to judgment as a matter of law. *Reeves*, 530 U.S. at 148; *see also*

*Richardson v. Comm'n on Human Rights & Opportunities*, 532 F.3d 114, 125–26 (2d Cir. 2008)

(concluding that "overwhelming evidence" of legitimate reason for dismissal warranted

judgment as a matter of law). Mendez-Nouel's NYSHRL claim is analyzed under the same

framework, because "claims brought under New York State's Human Rights Law are

analytically identical to claims brought under Title VII." *Rojas*, 660 F.3d at 107 n.10.

Applying these principles to the record at summary judgment, the Court finds that

Mendez-Nouel has, at the very best, created a "weak issue of fact" as to pretext, which, measured

against the abundant and indeed overwhelming evidence offered by Gucci as to its basis for

putting Mendez-Nouel on leave and then terminating him, is insufficient to withstand Gucci's

motion for summary judgment. *Reeves*, 530 U.S. at 148; *Richardson*, 532 F.3d at 125–26.

Mendez-Nouel makes two primary arguments to show pretext.[10]  First, he claims that the

temporal proximity between his complaint (February 26, 2009) and his suspension (March 6,

2009) and termination (March 19, 2009) could permit a fact finder to find that those employment

actions were pretextual.  Second, he argues that inconsistencies and/or errors in Gucci's report of

the pre-termination investigation could validly lead a fact finder to conclude that the entire

exercise was a sham—a façade to enable Gucci to cover up his retaliatory termination.  Neither

argument withstands analysis.

> **1.** **The Facts Do Not Permit an Inference of Pretext Based on the Temporal Proximity of His Complaint and Gucci's Adverse Actions**

---

[10] Mendez-Nouel's brief has a section arguing that there is a causal connection between his complaint and his termination.  The existence of such a connection is ordinarily considered both at the *prima facie* stage of the analysis and in assessing whether an employer's justification for adverse employment action is pretextual, and the Court does so here.

Mendez-Nouel observes, correctly, that the "causal connection needed for a proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action."  Pl. Br. 19 (quoting *Cifra v. G.E. Co.*, 252 F.3d 205, 217 (2d Cir. 2001)).  However, such a causal inference may be negated—or, put differently, the causal chain broken—where an intervening event post-dating the protected conduct provides an independent basis for the adverse action, or where the uncontroverted evidence otherwise renders the inference unreasonable in the case at hand.  *See Thompson v. Morris Heights Health Ctr.*, No. 09-cv-7239, 2012 U.S. Dist. LEXIS 49165, at *28 (S.D.N.Y. Apr. 6, 2012); *Nolley v. Swiss Reinsurance Am. Corp.*, No. 10-cv-7626, 2012 U.S. Dist. LEXIS 30955, at *47 (S.D.N.Y. Mar. 8, 2012); *Lytle v. JPMorgan Chase*, No. 08-cv-9503, 2012 U.S. Dist. LEXIS 15599, at *107–09 (S.D.N.Y. Feb. 8, 2012) (Report & Rec.) (plaintiff's unwillingness to comply with employment requirement defeats causal inference generated by temporal proximity between protected conduct and adverse action); *Hartley v. Rubio*, 785 F. Supp. 2d 165, 182 (S.D.N.Y. 2011) (inference of causation created by temporal proximity is negated when uncontroverted facts demonstrate that adverse actions began before protected activity occurred); *Joseph v. Marco Polo Network, Inc.*, No. 09-cv-1597, 2010 U.S. Dist. LEXIS 119713, at *49–56 (S.D.N.Y. Nov. 10, 2010)  (finding no causal inference where plaintiff's breach of company procedures, as well as protected conduct, predated adverse action).

Here, it is undisputed that less than two weeks after Mendez-Nouel complained of Daly's and Gray's alleged harassment, Mendez-Nouel's co-worker Meryam Kabsy complained to Gucci's HR representative, Strober-Lewin, that she was concerned about his mental state and felt the situation was "dangerous."  Although Mendez-Nouel challenges the process and outcome of the investigation that followed this complaint, as discussed *infra*, there is no dispute that Kabsy's

complaint was made, or that it triggered the investigation which led to Mendez-Nouel's

suspension and termination.  In light of these undisputed facts, a jury could not fairly draw an

inference of pretext based on the short passage of time between Mendez-Nouel's protected

activity (his complaint) and his suspension and termination.

> ### 2. Mendez-Nouel's Criticisms of the Investigation Report Are Insufficient to Give Rise to a Genuine Issue of Material Fact

Mendez-Nouel's other basis for claiming pretext consists of various procedural or

substantive challenges to Gucci's investigation of Kabsy's complaint.  Specifically, Mendez-

Nouel claims that the investigation suffered from the following defects:

1. Gucci's human resources employees created a record allegedly based on the statements of Mendez-Nouel's co-workers, but, in discovery in this case, some co-workers denied making certain statements attributed to them, and the report exaggerated other statements or took them out of context.

2. Gucci made its decision to terminate Mendez-Nouel before speaking with him.

3. Gucci's reasons for terminating Mendez-Nouel were "fabricated" and "intentionally ignored mitigating information."

4. After Mendez-Nouel's termination, Gucci now claims his termination was justified based on additional reasons not mentioned in his termination letter.

5. Mendez-Nouel was a good, productive sales employee (and therefore, presumably, his termination was not merited).

Pl. Br. 21–22.  None of these asserted deficiencies, when viewed in light of the evidence in

record at summary judgment, would permit a reasonable juror to find Gucci's investigation to

have been pretextual.  The Court addresses the five issues raised by Mendez-Nouel in turn.

First, Mendez-Nouel misstates the testimony of his co-workers when claiming that they

"denied" having made the statements attributed to them.  Two co-workers—Iva Mendez and

Andrew Grier—testified that they did not, three years later, specifically *recall* making the

statements attributed to them in the interview notes taken during Gucci's investigation.  *See, e.g.*,

Pl. 56.1 ¶ 40.  But such testimony is insufficient to show that they did not make the statements attributed to them.  That is especially so given that, in a number of instances, the co-worker in question testified that the statement "sound[ed] familiar."  *See, e.g.*, Mendez Dep. 51.

Mendez-Nouel also claims that Grier flatly denied telling HR that Mendez-Nouel had discussed shooting people.  *See* Pl. 56.1 ¶ 40.  However, at his deposition, Grier testified only that "I can't say that I told [the HR representative that Mendez-Nouel discussed shooting people]."  Grier Dep. 73.  That statement is properly cast not as a denial, but as a lack of recollection.  Similarly, Mendez-Nouel claims that Grier denied, at his deposition, that Mendez-Nouel ever discussed with him the "cleansing of certain people."  Pl. 56.1 ¶ 40.  That is true— but, as the next line in Grier's deposition transcript reflects, Grier also confirmed that he had *heard* that Mendez-Nouel spoke of such topics with other employees.  *See* Grier Dep. 95.  This undercuts the inference that Mendez-Nouel seeks to draw—that Grier's purported knowledge of such comments was fabricated by Gucci's HR personnel out of a retaliatory motive.  In sum, Mendez-Nouel's attempt to tease an inference of fabrication and retaliation based on HR's alleged misreporting of his co-workers' statements does not have a basis in fact.  At most, Mendez-Nouel's identification of what are arguable defects as to the precision of Gucci's recitation of isolated interview statements gives rise to a very "weak issue of fact"—insufficient to withstand summary judgment given the overwhelming evidence supporting Gucci's stated reason for the termination.  *Reeves*, 530 U.S. at 148.

Second, Mendez-Nouel claims that a retaliatory motive can be inferred from the fact that Gucci made the decision to terminate him before HR spoke to him.  It is, however, undisputed that Gucci's HR staff *did* interview Mendez-Nouel by phone on March 18, 2009, one day before

he was terminated.  *See* Pl. 56.1 ¶ 126.[11]  Mendez-Nouel points to email traffic within Gucci's

HR department that suggests that the company had prepared the relevant separation documents

before they spoke with him, and that therefore his termination was a foregone conclusion.  *Id.*

¶¶ 124–25.  However, without more, the preparation of documents for a plausible outcome does

not itself demonstrate that the minds of Gucci's HR executives were made up prior to the

interview; to the contrary, it suggests only that termination was an outcome that Gucci knew it

would have to consider.  This argument, too, creates at most only a very "weak issue of fact" as

to whether the investigation was, as Mendez-Nouel claims, a sham.

Third, Mendez-Nouel asserts, in conclusory fashion, that the reasons for his termination

were "fabricated" and that Gucci "intentionally ignored mitigating information."  Pl. Br. 22.  But

Mendez-Nouel does not identify any evidence supporting this conclusion.  His personal

disagreement with the report's conclusions is not sufficient to call its integrity into question.  *See*

*Adia v. MTA Long Isl. R.R.*, No. 02-cv-6140, 2006 U.S. Dist. LEXIS 51045, at *26 (E.D.N.Y.

July 26, 2006) ("Even if the [employer's] investigation's findings are incorrect, when an

employer relies on information in good faith in making an employment decision, there is no

statutory violation."); *cf. Kariotis v. Navistar Int'l Transp. Corp.*, 131 F.3d 672, 677 (7th Cir.

1997) (summary judgment appropriate where plaintiff claimed investigation was "imprudent, ill-

informed, and inaccurate," because "a reason honestly described but poorly founded is not a

pretext as that term is used in the law of discrimination").

---

[11] Mendez-Nouel also suggests that this interview should have been conducted in person, rather than over the phone.  However, anti-discrimination laws do "not mandate that employers use any particular procedures for investigating allegations of employee misconduct."  *Saenger v. Montefiore Med. Ctr.*, 706 F. Supp. 2d 494, 515 (S.D.N.Y. 2010).  Given the reports that co-workers had made about Mendez-Nouel's erratic behavior and alarming statements, it was hardly unreasonable for Gucci to decide to interview him by phone.

Simply put, nothing in the law mandates that an employer make hiring or firing decisions on the basis only of facts or evidence that the impacted employee or candidate accepts. Gucci was not required to overlook the various troubling reports of Mendez-Nouel's conduct because Mendez-Nouel viewed the events related to Gucci as fanciful, benign, or, if negative, triflingly so. Indeed, an "'employer need not prove . . . that it made the wisest choice, but only that the reasons for the decision were nondiscriminatory.'" *Byrne v. Telesector Res. Group, Inc.*, 339 F. App'x 13, 17 (2d Cir. 2009) (quoting *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 641 (2d Cir. 1986)). Here, the contemporaneous notes of Gucci's investigation, the persuasiveness of which Mendez-Nouel has failed to undercut, show that Gucci had received an array of troubling reports from co-workers that legitimately gave rise to concerns about workplace safety, and comfortably justified his suspension and termination. And Mendez-Nouel, for his part, has not presented any hard evidence—or any meaningful circumstantial evidence besides the temporal proximity of his suspension and termination to his complaint—that the entire investigation was a sham designed to mask his retaliatory termination.

Finally, the fourth and fifth issues that Mendez-Nouel takes with the investigation are clearly irrelevant to the discrete question of whether his March 2009 termination was motivated by retaliatory animus. That Gucci has attempted to bolster the factual record after Mendez-Nouel's termination does not suggest that retaliatory animus motivated that decision. Mendez-Nouel's sales performance is also beside the point—Gucci has never claimed that he was fired for poor performance. These asserted shortcomings, too, fail to support an inference that his termination was borne of or tainted with retaliatory intent.

In sum, the Court finds that Mendez-Nouel has failed to generate more than a very "weak issue of fact" as to whether the reasons given for his termination are pretextual. *See*

*Zacharowicz v. Nassau Health Care Corp.*, 177 F. App'x 152, 155 (2d Cir. 2006) (summary

order) (affirming dismissal of claim where plaintiff failed to raise more than a weak issue of fact

as to invidious motivation for employment action); *Monte v. Ernst & Young LLP*, 148 F. App'x

43, 45 (2d Cir. 2005) (summary order) (same); *Barney v. Consol. Edison Co.*, No. 99-cv-823,

2009 U.S. Dist. LEXIS 127178, at *67–69 (E.D.N.Y. Oct. 1, 2009); *Lambert v. McCann*

*Erickson*, 543 F. Supp. 2d 265, 283 (S.D.N.Y. 2008); *Blake v. Bronx Leb. Hosp. Ctr.*, No. 02-cv-

3827, 2007 U.S. Dist. LEXIS 75770, at *26–27 (S.D.N.Y. Oct. 10, 2007).  Gucci, by contrast,

has mustered overwhelming evidence that it terminated Mendez-Nouel as a result of well-

founded concerns about his stability, and about the safety of the workplace, based on a series of

mutually reinforcing accounts of his alarming behavior given by his co-workers.

Accordingly, Gucci's motion for summary judgment against Mendez-Nouel's retaliation

claims under Title VII and the NYSHRL are granted as well.

## VII.   Supplemental Jurisdiction and Mendez-Nouel's NYCHRL Claims

Because Mendez-Nouel's claims of discrimination, harassment, and retaliation under

Title VII have been dismissed, the Court must decide whether to retain jurisdiction over his

remaining claims.  These are his claims of discrimination, harassment, and retaliation under the

NYSHRL and NYCHRL.  As stated above, the Court has addressed Mendez-Nouel's NYSHRL

claims in the discussion of his Title VII claims, because the standards of Gucci's liability under

the two statutes are coterminous.  The Court, however, has not addressed Mendez-Nouel's

NYCHRL claims because, unlike the NYSHRL, the standard for liability under the NYCHRL

differs from the Title VII standard.  *See Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d

712, 723 (2d Cir. 2010).  The Court's exercise of supplemental jurisdiction over some, but not

all, of Mendez-Nouel's state law claims merits explanation.

Federal district courts have supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). As the Supreme Court stated in discussing Section 1367's predecessor judicial doctrine of pendent jurisdiction, this is traditionally "a doctrine of discretion, not of plaintiff's right." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966). Subsection (c) of Section 1367 "confirms the discretionary nature of supplemental jurisdiction by enumerating the circumstances in which district courts can refuse its exercise." *City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997). Of particular relevance here, a district court "may decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).

Once a district court's discretion is triggered under Section 1367(c)(3), it balances the traditional "values of judicial economy, convenience, fairness, and comity" in deciding whether to exercise jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988). Both the Second Circuit and the Supreme Court have held that, as a general rule, "when the federal claims are dismissed the 'state claims should be dismissed as well.'" *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *United Mine Workers*, 383 U.S. at 726). Although the exercise of supplemental jurisdiction is discretionary, the ordinary case "will point toward declining jurisdiction over the remaining state-law claims." *In re Merrill Lynch*, 154 F.3d at 61 (citing *Cohill*, 484 U.S. at 350 n.7).

Here, however, the "values of judicial economy, convenience, fairness, and comity," *Cohill*, 484 U.S. at 350, support the exercise of supplemental jurisdiction over Mendez-Nouel's NYSHRL claims. That is because, as discussed, the standards of liability are identical under

31

Title VII and the NYSHRL.  Forcing Gucci to defend against Mendez-Nouel's NYSHRL claims in state court, when this Court has already invested the judicial resources to resolve them, does not advance the interests of judicial economy, convenience, or fairness.  *See Kashelkar v. Bluestone*, No. 06-cv-8323, 2007 U.S. Dist. LEXIS 71313, at *4 (S.D.N.Y. Sept. 26, 2007) ("[I]t is appropriate to exercise supplemental jurisdiction to rule on the merits of Plaintiff's state claims notwithstanding the dismissal of the federal claims, because all of the claims arise from the same set of operative facts and are plainly lacking in merit, and because the interests of justice would not be served by requiring Defendants to oppose those claims in new state court litigation.").  Nor is there a substantial comity concern raised by this Court's application of state law with which courts in this District are eminently familiar, and which is applied by those courts every day.  The Court therefore finds that the *Cohill* factors weigh in favor of supplemental jurisdiction over Mendez-Nouel's NYSHRL claims.  And, because those claims are co-terminous both legally and factually with Mendez-Nouel's Title VII claims, they, too, are dismissed.

Those same factors, however, compel the Court to decline to exercise supplemental jurisdiction over Mendez-Nouel's NYCHRL claims.  As noted, the standard of Gucci's liability is materially different under the NYCHRL from that under Title VII and the NYSHRL.  The Court thus has not invested the judicial resources necessary to resolve those claims, and it is therefore not obvious that those claims are meritless as a matter of law, or that Gucci would be unfairly put upon by being forced to defend those claims in New York state court.

Moreover, dismissing those claims would not substantially delay this litigation, as it does not appear that additional discovery will be needed should these claims be pursued in state court.  *See Murray v. Visiting Nurse Servs.*, 528 F. Supp. 2d 257, 280–81 (S.D.N.Y. 2007) (collecting cases).  And "since New York's C.P.L.R. § 205 allows a plaintiff to recommence a dismissed

32

suit within six months without regard to the statute of limitations, [Mendez-Nouel] will not be unduly prejudiced by the dismissal of . . . state law claims." *Trinidad v. NYC. Dep't of Corrs.*, 423 F. Supp. 2d 151, 169 (S.D.N.Y. 2006). The Court therefore declines jurisdiction over Mendez-Nouel's NYCHRL claims, and they are dismissed without prejudice.

## CONCLUSION

For the foregoing reasons, Gucci's motion is granted as to Mendez-Nouel's claims under Title VII and the NYSHRL. The Clerk of Court is directed to enter judgment in Gucci's favor as to those claims. Because the Court declines to exercise supplemental jurisdiction over Mendez-Nouel's NYCHRL claims, they are dismissed without prejudice.

The Clerk of Court is directed to terminate the motion at docket number 29, and to close this case.


SO ORDERED.

*Paul A. Engelmeyer*
_____
Paul A. Engelmayer
United States District Judge


Dated: November 8, 2012
      New York, New York

33